Thomas Charles **WHITSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 46192.

Court of Criminal Appeals of Texas.

June 13, 1973.

Rehearing Denied July 3, 1973.

James E. Ferguson, Cleburne, Toby Goldsmith, Fort Worth, for appellant.

Doug Crouch, Dist. Atty., R. J. Adcock, William A. Knapp, J. J. Heinemann, Asst. Dist. Attys., Fort Worth, Jim D. Vollers, State's Atty. and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

In a trial before a jury on a plea of not guilty, appellant was convicted of murder without malice. Punishment was assessed by the jury at five years confinement.

The record reflects from the State's evidence that Mrs. Mary Ann Boles, widow of the deceased Ralph Godfrey Boles, had previously been married to the appellant. They had a son, Jess Thomas Whitson, who was nine years old at the time of the shooting on June 5, 1970, here involved. Appellant and his wife Mary Ann were divorced in 1967. She got custody of Jess, with appellant securing visitation rights on the first and third Fridays of each month from 5:00 P.M. Friday until 9:00 A.M. Sunday. Thereafter Mary Ann married the deceased, and remained his wife until his death as a result of being shot by appellant.

There was much controversy between the mother and father of Jess over the enforcement of the father's visitation rights. On Friday, June 5, 1970, Jess phoned appellant and told him that he was to practice Little League baseball that weekend, and preferred not to visit with him. Appellant insisted on the visit, however, and promptly at five o'clock arrived at the Boles' house. When he entered the house, according to Mrs. Mary Ann Boles and Jess, he drew a pistol and "waived it around." Deceased, who was in the front entrance, told his wife and Jess to go in the back of the house while he and appellant had a talk. The wife and Jess went to the back of the house where she telephoned the police. Then she and Jess left

by a window and went to a neighbor's and she again called the police. She learned from them that her husband had been shot. She went back to her home, and found the ambulance and police there. Her husband was taken to the hospital, where he remained for 18 days in intensive care until his death. The attending doctor testified deceased died on June 23, 1970 of peritonitis and respiratory failure due to gunshot wounds in the abdomen.

A police officer testified that when he arrived at the Boles' home shortly after 5:00 P.M. in answer to a radio call, he found appellant standing in the front room with a pistol, and a man later identified as the deceased, Boles, sitting in a chair unconscious with two gunshot wounds about his stomach. Appellant handed the officer the pistol, saying: "I shot him twice . . he wouldn't let me have my son . . I guess he thought I was kidding."

It was stipulated that if a ballistics witness were present in court, he would testify that the bullets which were introduced in evidence as having wounded deceased were fired from the pistol handed the officer by appellant.

A statement made by deceased to his wife while he was in intensive care concerning the shooting was admitted in evidence as a dying declaration. More will be said of this under appellant's ground of error number three.

Appellant testified, admitting the shooting, but stating that he shot in self-defense when deceased, a much larger man, attacked him and was choking him at the time of the shooting. He further testified of threats against his life by deceased. The issue of self-defense was fully covered by the court's charge.

The evidence was amply sufficient to support the jury's verdict. Appellant's fourth ground of error contending otherwise is overruled.

Appellant, in his first ground of error, contends that the court committed funda-

mental and reversible error in his definition of "reasonable doubt" included in his charge to the jury. The court defined "reasonable doubt" as follows:

"You are instructed that by 'reasonable doubt' is meant an honest or substantial, not a capricious or a fanciful doubt, but a doubt which, based upon the evidence, would cause reasonable men to differ as to the guilt or innocence of the Defendant."

The record discloses the following as part of the proceedings in open court:

"On the 27th of May, 1971, after the evidence had been concluded the day before; and with the Defendant and all Counsel present, the following occurred:

"THE COURT: Mr. Goldsmith, do you have any exceptions to the charge?

"MR. GOLDSMITH (Attorney for appellant): Is that the same one that I have a copy of?

"THE COURT: Yes, it has not been changed.

"MR. GOLDSMITH: No sir. I have no objections or exceptions to it.

"THE COURT: You have no additional charges?

"MR. GOLDSMITH: No sir."

Appellant filed no objections to the charge. He was furnished a copy of the court's charge containing the definition of reasonable doubt, accepted the definition as given, and made no objection thereto. Nothing is presented for review unless the alleged error is fundamental. Art. 36.14, Vernon's Ann.C.C.P.; King v. State, Tex. Cr.App., 490 S.W.2d 580; Jackson v. State, Tex.Cr.App., 491 S.W.2d 155; Murry v. State, Tex.Cr.App., 491 S.W.2d 118; De La Garza v. State, Tex.Cr.App., 379 S.W. 2d 904; Monroe v. State, Tex.Cr.App., 465 S.W.2d 757; Woods v. State, Tex.Cr.App., 479 S.W.2d 952; Bryant v. State, 492 S. W.2d 947 (Tex.Cr.App.1973).

Appellant argues that the court committed fundamental reversible error in defining "reasonable doubt" as being "a doubt which based upon the evidence, would cause reasonable men to differ as to the guilt *or innocence* of the Defendant." (Emphasis ours) He says that the addition of the words "or innocence" destroyed the law's presumption of innocence, and shifted the burden of proof to the defendant to prove his innocence.

The court properly charged on the law of presumption of innocence, and on the law of reasonable doubt. We do not approve of the definition of reasonable doubt as given; in fact this Court has held in a number of cases that the language of the statute on reasonable doubt needs no amplification or attempt on the part of the trial court to explain the term. Massey v. State, 1 Tex.App. 563; Abram v. State, 36 Tex.Cr.R. 44, 35 S.W. 389; Marshall v. State, 76 Tex.Cr.R. 386, 175 S.W. 154; Allen v. State, 141 Tex.Cr.R. 94, 146 S.W.2d 384; Gallegos v. State, 152 Tex.Cr.R. 508, 215 S.W.2d 344; Pierce v. State, 159 Tex. Cr.R. 504, 265 S.W.2d 601.

■ In view of the court's charge as a whole, we do not find that the error in the definition of reasonable doubt constitutes fundamental error.

Appellant's first ground of error is overruled.

Appellant's second ground complains of error in the court permitting television coverage of a portion of the trial without appellant's consent.

There is nothing in the record which shows that there was any television coverage of any portion of the trial. The only reference to television coverage is that contained in appellant's amended motion for new trial, wherein he alleged in part:

"Because the Defendant's constitutional right of due process of law was violated and he was deprived of his right to a fair and impartial trial when the televi-

sion media was allowed to focus their cameras on the jury in the Courtroom and grind away in full view (only a few feet away) and hearing of the said jurors. This occurred while the jury was in the jury box, after returning their verdict, but prior to their consideration of punishment."

The motion contains a jurat that it was subscribed and sworn to before a notary public.

No evidence was introduced at the hearing on the motion for a new trial to show that there was any television coverage at the trial. No bill of exception was prepared and filed to that effect.

▆▆ Factual allegations contained in a motion for new trial must be proved before the appellate court can consider them; the allegations are not proof of the facts alleged. Mackey v. State, Tex.Cr.App., 480 S.W.2d 720; Allsup v. State, Tex.Cr.App., 495 S.W.2d 238, (1973); Webb v. State, Tex.Cr.App., 460 S.W.2d 903. There is, consequently, nothing presented for review. Appellant's second ground of error is overruled.

Appellant's third ground contends error in the action of the court in admitting, over his objections, "an oral dying declaration hearsay testimony which did not meet the requirements set out in Article 38.20," V.A.C.C.P.

Article 38.20, V.A.C.C.P., sets out the requirements for the admissibility of the deceased's declaration as follows:

"1. That at the time of making such declaration he was conscious of approaching death, and believed there was no hope of recovery;

"2. That such declaration was voluntarily made, and not through the persuasion of any person;

"3. That such declaration was not made in answer to interrogatories calcu-lated to lead the deceased to make any particular statement;

"4. That he was of sane mind at the time of making the declaration. Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722."

While Mrs. Mary Ann Boles, widow of the deceased, was on the stand the State announced to the court that it was preparing to lay a predicate for the introduction of a "dying declaration" of the deceased. The jury was excused, and a hearing was thereupon had before the court.

Mrs. Boles testified that deceased was taken to the hospital the evening of June 5, and was operated on for the wounds in his abdomen. On the next day, he had a tracheotomy which resulted in a breathing pipe being inserted in his throat. He could not talk under these circumstances. He was kept in the intensive care unit from his entrance into the hospital on the evening of June 5 until his death on June 23. Dr. O'Neill, the attending physician, testified as to the severity of deceased's condition.

On June 8, Mrs. Boles was allowed to visit deceased for a five minute period. He could not talk, but was able to communicate by means of writing on a light carbon tablet. She testified to the sanity of deceased. She testified that deceased "was concerned over his death," and felt that Jess should be there. She testified that appellant then made the following statement, writing it on the slate:

"I know I am going to die. I want you to know what happened. He said: Tom and I came into the living room and we were talking . . In a few minutes he jumped up and started raving and screaming, and said 'I am going to kill those two S.O.B.s' . . . .

"And when he said that,[1] 'I shook my head and said, No, just me.'

---

1. Apparently this refers to what deceased wrote on the slate.

**948**

"And he said:

"No. Two. He called your name and he called Jess' name . . . And he kept repeating 'I'll kill 'em, I'll kill 'em.'"
. .

"And he said:

"Tell them I'll kill 'em.

"And I said:

"I couldn't let that happen. And I reached for the gun, and it went off and struck me where it burned . . . The second time, it knocked me to the floor, and I couldn't get up." . . . .

"Q (MR. ADCOCK) Did he tell you where he went and how he got there?

"A Yes. He said he crawled into the back bedroom.

"Tom stood over him and kicked him . . Finally he managed to get to this chair, by the telephone. He said he begged Tom to call the Police and an ambulance . . He said Tom put the gun to his head, and told him he was going to blow his brains out . . He said he was in such pain that he begged Tom to go ahead, if that was what he wanted to do—to call for an ambulance, or to kill him.—that he could not stand the pain any longer."

Mrs. Boles testified at this hearing that deceased told her, on each occasion she visited him, that he knew he was going to die. "Of course my reaction was that I tried to tell him that all those things that he was telling me that had been going on, were not necessary, because he was going to get well. But he kept telling us 'no, he was not.'"

She testified further that he repeatedly told her he knew he was going to die, and that the pain was so intense he prayed "it would happen soon."

Her testimony was that his declaration was voluntarily made, and was not through any persuasion; and that it was not made in answer to any questions calculated to lead him into making any statement.

At the conclusion of the hearing, the court overruled appellant's objections, and ruled that the predicate required by Article 38.20, V.A.C.C.P., had been laid for the introduction of the statement of deceased made on June 8. Thereafter, the evidence was repeated before the jury, over appellant's objections theretofore made. The court duly submitted the fact issue as to the making of the declaration to the jury, and properly charged on the issue in his written charge to the jury.

A study of the record convinces us that the trial court correctly ruled that a proper predicate was laid by the State for the introduction of the statement of deceased to his wife as a dying declaration. The testimony of Mrs. Boles meets all four requirements set forth in Article 38.20, V.A.C.C.P. Walker v. State, 88 Tex.Cr.R. 389, 227 S.W. 308; McKinney v. State, 80 Tex.Cr.R. 31, 187 S.W. 960; Marteliano v. State, 155 Tex.Cr.R. 570, 237 S.W.2d 857; Downing v. State, 113 Tex.Cr.R. 235, 20 S.W.2d 202; Webb v. State, 133 Tex.Cr.R. 32, 106 S.W.2d 683; Tucker v. State, 141 Tex.Cr.R. 428, 148 S.W.2d 1111.

Appellant raises the contention that the statement could not be a dying declaration, since the deceased lived for fifteen days thereafter.

"It is also established that if the dying declarations were made under a consciousness of impending death, without hope of recovery, the length of time deceased lived after making the statement is immaterial." McKinney v. State, supra. See, also, Walker v. State, supra.

Appellant's third ground of error is overruled.

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.