Edward Lincoln KING, Appellant,

v.

The STATE of Texas, Appellee.

No. 53641.

Court of Criminal Appeals of Texas.

May 11, 1977.

Rehearing Denied June 8, 1977.

Paul P. Riley, Dallas, for appellant.

Henry Wade, Dist. Atty., John H. Hagler, Jon Sparling and Stephen P. Tokoly, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

Appellant was convicted for capital murder after having been indicted for shooting and killing Leslie G. Lane, a Dallas police officer. V.T.C.A., Penal Code Sec. 19.-03(a)(1). Punishment was assessed at death after the jury affirmatively answered the issues submitted to them at the punishment stage of the trial pursuant to Art. 37.071, V.A.C.C.P.

The six grounds of error presented for our review challenge the charges submitted to the jury at the guilt and punishment stages of the trial. The sufficiency of the evidence is not contested.

Before the charge was submitted to the jury at the guilt stage of the trial, the appellant requested the court to "give instructions to the jury limiting extraneous acts to the purpose for which such evidence was admitted." Appellant apparently desired a limiting instruction on evidence of extraneous offenses he committed both shortly before and after the murder of Officer Lane. These offenses included theft of a police officer's car, aggravated assault, theft of a policewoman's pistol and purse, resisting arrest, and impersonation of a police officer.

In his brief, appellant concedes that the evidence of the extraneous offenses was "probably legally admissible." He contends, however, that the court should have instructed the jury that such evidence should be limited to the issue of appellant's identity.

Two valid reasons exist for overruling this ground of error. First, the evidence of the extraneous offenses showed "the context in which the criminal act occurred—what has been termed the 'res gestae'." *Albrecht v. State,* Tex.Cr.App., 486 S.W.2d 97 at 100. In *Arivette v. State,* 513 S.W.2d 857, at 864, we stated:

"... it is not necessary to give a limiting instruction on an extraneous offense which constitutes a part of the res gestae of the offense for which an accused is on trial."

The second basis for overruling appellant's contention is provided by the generous charge given by the trial court at the guilt stage of the trial:

"You are further instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the context, if it does, in which the act alleged in the indictment occurred, if it did, and in determining the identification of the defendant, if any

was in fact determined, in connection with the offense, if any, alleged against him in the indictment and for no other purpose."

Appellant is in no position to challenge the charge given by the trial court since he received more than he was entitled to under our decision in *Arivette v. State,* supra. This ground of error is without merit.

■ The final five grounds of error complain of the charge submitted to the jury at the punishment stage of the trial.

Appellant asserts that the trial court committed reversible error by failing, after timely request, to define the following words contained in Art. 37.071(b), V.A.C.C.P.:[1] deliberately; probability; criminal acts of violence; continuing threat to society. At the time of appellant's trial,[2] Article 3.01, V.A.C.C.P., provided:

"All words, phrases, and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specifically defined; and, unless herein specially excepted have the meaning which is given to them in the Penal Code."

The words and phrases in issue have not been specially defined.

This Court has been faced with similar contentions in the past. In *Joubert v. State,* 136 Tex.Cr.R. 219, 124 S.W.2d 368, we held that the word "voluntarily" as contained in the indictment charging murder with malice need not be defined. We have also stated that "burglarious entry," *Thomas v. State,* Tex.Cr.App., 543 S.W.2d 645; "sound memory and discretion," *Hogan v.*

*State,* Tex.Cr.App., 496 S.W.2d 594; "reasonable doubt," *Whitson v. State,* Tex.Cr.App., 495 S.W.2d 944; and "pre-meditated design," *Mitchell v. State,* Tex.Cr.App., 365 S.W.2d 804; need not be defined.[3]

The reason for not requiring the definition of common terms and phrases was stated in *Joubert v. State,* supra:

"Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." 124 S.W.2d at 369.

Appellant contends that the jury will not have adequate guidelines to assist its determination of the issues contained in Art. 37.071, supra, unless definitions for the terms contained therein are provided in the charge to the jury. In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, however, the Supreme Court of the United States concluded that the submission of the issues provided by Art. 37.071, supra, constitutionally guided the jury's determination of the punishment issues. No special definitions of the terms of that statute were required.

We hold that the court need not provide special definitions for these terms in its charge to the jury during the punishment stage of a capital murder trial. Appellant's grounds of error are overruled.

■ The final ground of error asserts that the court erroneously refused to sub-

---

1. Article 37.071(b), supra, provides: "On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; . . ."

2. Art. 3.01, supra, was amended in 1975 and now provides: "All words, phrases and terms used in this Code are to be taken and under-

stood in their usual acceptation in common language, except where specially defined."

3. Also see, *Powell v. State,* Tex.Cr.App., 538 S.W.2d 617, where we held that the meaning of the term "an act of violence or threatened violence to a person or property" as used in V.T.C.A., Penal Code Sec. 46.05, can be understood by a person of ordinary intelligence. In *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App. 1976), we concluded that the term "a probability" in Art. 37.071(b)(2), supra, is not vague or overbroad and that it does present an intelligible standard for determination of the punishment issue in a capital murder trial.

mit a charge on circumstantial evidence with regard to the issue of whether there was a probability he would commit future acts of violence constituting a continuing threat to society. (Issue number two of Art. 37.071, supra.) This contention was expressly rejected in *Shippy v. State* (Tex. Cr.App., No. 53,831, April 27, 1977). The final ground of error is overruled.

The judgment is affirmed.

PHILLIPS, Judge, concurring.

For the reasons set forth in *Shippy v. State* (Tex.Cr.App., No. 53,831, decided April 27, 1977), I concur in the overruling of appellant's fifth ground of error relating to the giving of a charge on circumstantial evidence at the punishment phase of the trial.

Although the issue was not raised in the brief, I believe it is the duty of this Court to pass on the sufficiency of the evidence to support the jury's answer "yes" to the three special issues submitted under Art. 37.-071(b), V.A.C.C.P.

The Supreme Court announced in *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976):

"By providing prompt judicial review of the jury's decision in a court with state-wide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution. *Furman v. Georgia,* 408 U.S., [238] at 310, 92 S.Ct. at 2762 [33 L.Ed.2d 346]".

In upholding Georgia's capital-sentencing procedures, the Supreme Court noted in *Gregg v. Georgia,* 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976):

"As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's supreme court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases.

\* \* \* \* \* \*

Moreover to guard further against a situation comparable to that presented in *Furman*[1], the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate. On their face these procedures seem to satisfy the concerns of *Furman*."

Similarly, in *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) the Supreme Court held:

"The Florida capital-sentencing procedures thus seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner. Moreover, to the extent that any risk to the contrary exists, it is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida 'to determine independently whether the imposition of the ultimate penalty is warranted.' [Citations omitted]. The Supreme Court of Florida like that of Georgia, has not hesitated to vacate a death sentence when it has determined that the sentence should not have been imposed. Indeed, it has vacated eight of the 21 death sentences that it has reviewed to date. [Citations omitted.]

Under Florida's capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. More-

---

1. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

over, their decisions are reviewed to insure that they are consistent with other sentences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases where it is not." ' *Gregg v. Georgia,* ante; 428 U.S. p. 188, 96 S.Ct. p. 2932, quoting *Furman v. Georgia,* 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring). On its face the Florida system thus satisfies the constitutional deficiencies identified in *Furman.*"

See also *Livingston v. State,* Tex.Cr.App., 542 S.W.2d 655, at page 663 (dissenting opinion).

This conviction arises out of a series of events that led to the shooting of Officer Leslie G. Lane, a Dallas police officer, during the early morning hours of March 2, 1974. About 11:00 p. m., March 1, appellant assaulted Officer Betty Robinson of the Dallas Police Department with a chrome plated pistol and he took her car which contained her service revolver, purse, badge and handcuffs. These items, along with a chrome plated pistol, were found underneath the cushions of the sofa on which appellant was sleeping at the time of his arrest around 7:00 a. m., March 2.

About 2:00 or 2:30 a. m. on March 2, two prostitutes got into a car matching the description of Officer Robinson's car. Appellant was identified in court as the driver of the car. One of the women escaped, but appellant drove away with the other woman, telling her he was taking her to White Rock Lake and he would kill her. The woman was forced to sit on the floor of the car between the dashboard and the front seat, but she was able to hear sirens and she could see reflections of flashing red lights. Appellant stopped the car and she heard another car door slam, saw a police officer approach the car and asked the officer to help her because the man was trying to kill her. Appellant drove off and she heard sirens at a distance. The car wrecked into a lawn; appellant crawled out the window on the driver's side and ran behind some bushes. A uniformed police officer also went around the bushes and then she heard two gun shots.

Officer Thomas testified he was on duty in a marked police car at 2:45 a. m., March 2, when he observed a car matching the description of Officer Robinson's car with one occupant, identified in court as appellant. After following the car for a block, Officer Thomas turned on the siren and red light and the car pulled over. Officer Thomas approached the car and noticed the man was looking in the rear view mirror and Thomas saw the head of a woman below the level of the seat. Before Officer Thomas reached the car, the man drove off, squealing the tires and fishtailing around the corner. Officer Thomas pursued the car for several blocks at a speed of over 100 miles per hour. Officer Thomas radioed the dispatcher and heard Officer Lane say he was right behind Thomas. The car driven by appellant ended up in the front yard of 4703 Live Oak. As Officer Thomas' patrol car skidded to a stop in the driveway, he saw the man crawl out the driver's window and told the man to halt. Officer Thomas heard two gun shots and ran toward the direction of the shots into the back yard of 4707 Live Oak. Officer Thomas could not see anyone, so he returned to the front of the house, whereupon he heard Officer Lane's voice. He found Officer Lane lying on his back on a grassy strip between two driveways. Lane told him he had been shot and to call for an ambulance.

Testimony showed Officer Lane died as the result of two gun shot wounds in the left lateral chest area. The shots had been fired from the .38 Smith and Wesson pistol that he been issued to Officer Robinson. A known palm print of appellant matched a palm print lifted from the hood of Officer Robinson's car.

About 3:00 a. m., March 2, a man identified as appellant approached two persons seated in a parked car. After identifying himself as a police officer and exhibiting a badge and a silver gun, appellant told the woman he would have to take her down-

town in connection with a robbery at a Seven-Eleven Store. After driving for a long time, appellant stopped in a driveway of a house that was for sale and opened the woman's purse, cursing when there was no money in it. They proceeded to another vacant house two or three blocks distant, where appellant got out of the car and left. The woman directed the police to the two houses and appellant was arrested later that morning at 3515 Frosty Trail, located across the alley from the second house.

At the punishment phase of the trial, the State introduced testimony of five witnesses that the appellant's reputation in the community for being a peaceful and law abiding citizen was bad. By fingerprint comparison, the State established that appellant had been previously convicted eleven times. Appellant was shown to have been convicted on January 16, 1962, of two misdemeanors, theft and carrying a prohibited weapon, a pistol; on March 27, 1962, of assault with intent to commit robbery; on April 9, 1963, of the misdemeanor offense of aggravated assault on a female; on April 22, 1963, of assault to murder with malice, robbery, two burglaries of a private residence at night, and three felony thefts. On April 22, 1963, appellant was sentenced to serve three ten-year terms and four twenty-year terms; he was paroled on June 26, 1972.

Appellant did not offer any evidence in his behalf at the guilt or punishment phase of the trial.

In light of the circumstances surrounding the instant offense, the evidence introduced at the punishment stage, and the lack of mitigating evidence, I would hold the evidence is sufficient to support the jury's answer of "yes" to the three special issues submitted under Art. 37.071(b), V.A.C.C.P.

For the foregoing reasons, I concur in the affirmance of this conviction.

ROBERTS, Judge, dissenting.

I dissent for the reasons stated in Part II of my dissenting opinion in *Shippy v. State* (Tex.Cr.App., No. 53,831, delivered April 27, 1977). Furthermore, the fact that the

jury is instructed that the State must prove each individual punishment element beyond a reasonable doubt does not cure the error of refusing a request for a circumstantial evidence charge when direct evidence of the main fact in issue is absent. This is the federal rule, *United States v. Rodriguez*, 523 F.2d 738 (5th Cir. 1975), which is not followed in Texas.