Elliott Rod JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69170.

Court of Criminal Appeals of Texas, En Banc.

Oct. 31, 1984.

Rehearing Denied Jan. 30, 1985.

Rehearing Denied March 20, 1985.

Dexter Patterson (on appeal only), Nederland, for appellant.

James S. McGrath, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury convicted appellant of capital murder. The jury also answered "yes" to each of the three special issues and the court assessed punishment at death in accordance with Art. 37.071(e), V.A.C.C.P.

On April 8, 1982, appellant and three other men drove to Beaumont to commit a robbery. Appellant and one of the other men, Maurice Andrews, rendezvoused at a Schlotzsky's Sandwich Shop around noon and walked over to observe Granado's Jewelry Store. Andrews was carrying a white handkerchief in one hand. The two entered the jewelry store where Joe Granado and Arturo Melindez were working. Appellant claimed in his confession that they ordered Granado and Melindez to lie down behind the counter and that he saw Granado reaching for something and yelled to Andrews, "Watch it, he's got a gun." Appellant stated that Andrews then turned around and fired a shot and appellant walked to the door and started outside. He said he heard "a few more rounds" and was almost across the street by the time Andrews rejoined him.

Joe Granado died from two gunshot wounds to the head. Arturo Melindez was also shot to death. One of the wounds to Granado was caused by a .38 caliber bullet fired at a distance of less than three feet from his head. The other wound was caused by a .22 caliber bullet fired less than a foot from his head. Dr. Stanley LeBer testified that the location of the wounds and the angle of the bullets were consistent with someone shooting Granado from a position in front of and above Granado. Dr. LeBer also testified that a bruise and laceration to Granado's right ear was of the type caused by a blunt force or object striking the ear and was consistent with a blow from the butt of a gun.

Louisa Morales testified that she worked at the Belle and Beau Tailor Shop which was located next door to the jewelry store. Morales testified that at about 12:15 in the afternoon on April 8, 1982 she heard two loud noises that sounded like somebody was hammering or pounding the wall of the jewelry store. She waited about 1½ minutes and walked to the door of the tailor shop. She saw two black men walking fast together, side by side, from Granado's Jewelry Store. She did not see their

faces, but described their appearance and said one man was taller than the other.

Joy Moore testified that shortly after noon on April 8, 1982, she left work to run an ·errand. She noticed two black men standing near the front of the tailor shop. She noticed that the taller one of the two was swinging a white handkerchief in his hand. Moore walked to a parking lot and turned around to see if the two were still there. They were gone. She testified that the jewelry store and the tailor shop were probably the only places the two men could have gone in the few minutes she was not looking at them, unless they had run somewhere. Moore identified appellant as the shorter of the two men she saw that day.

William Quimby testified that he saw two black men walk into Schlotzsky's around noon on April 8, 1982. He noticed them because they did not order anything and just walked into the restroom and then walked out carrying paper towels in their hands. Quimby also saw them shortly after noon, on the same side of the street as the Granado Jewelry Store, walking in the direction of the store; they were still carrying the paper towels.

A .38 caliber revolver and receipts marked "Granado Jewelry Store" were found on the premises of Malcome Davis, one of four men involved in the robbery; a firearms expert testified that the gun was the same one used in the shooting of Joe Granado. Police also found a quantity of jewelry taken in the robbery at Maurice Andrews' residence. No jewelry was found at appellant's residence; neither was the .22 caliber gun used in the robbery ever recovered. Police found a white handkerchief on the counter in the jewelry store.

Appellant challenges the sufficiency of the evidence to convict him because he contends that his confession is "not corroborated by any evidence from any source" that he took part in the robbery or was in the store during the robbery.

■ Appellant's confession was introduced at trial. The confession corrobo-rated many of the details testified to by witnesses:

My name is Elliott Rod Johnson.

. . . .

On Thursday, April 8th, 1982, sometime around noon, I was at my house laying down. Malcom Davis and guy named Maurice came to my house and woke me up. Maurice said that we had something to go do. I got up and put on my clothes because I thought they ment (sic) something like going to get high. We went outside and got in Malcom's car, a little white car. Malcom was driving and we went to a house in Pt. Arthur, I don't know whose house it was. Malcom went in and me and Maurice stayed in the car. He came back and then we went to a Aonic (sic) Burger stand and got something to eat. Maurice said he knew where we could go get some jewelry. I asked him what about money and he said he didn't know. Malcom drove us over to the new mall on our way to Beaumont and we stopped by the sears (sic) store. A guy named O'Neil, who I know from the streets was standing there in the parking lot. We met him there and then someone asked him where his truck was then told him we was (sic) going to drive over to where his truck was. We drove over to where his black pick up truck was parked. O'Neil walked over the pick up truck. O'Neil opened the door on the driver's side where Malcom was and nelt (sic) down. Maurice had already said it was in Beaumont where could get the jewelry and O'Neil was talking about how it would be easy for this jewelry store to get robbed and that he knew they were supposed to be working on jewelry for other stores like Zale's and Gordon's and stuff. O'Neil said there usually be (sic) one old man in the store. O'Neil said that we were riding too deep, for one of us to come get in the car with him. I told them I couldn't do no running because I had VD and my balls hurt. They told me to go with Maurice and that Maurice was going to be in a Schlotzky's (sic) sand-witch (sic) shop around the corner. Mau-

rice told me this when I got in the parking lot across from the jewelry store. Maurice had riden (sic) to Beaumont in the pick up truck with O'Neil and I rode with Malcom in his car. I got out of Malcom's car and went looking for Maurice. I passed by the sandwitch (sic) shop completely, and thats when I saw O'Neil's truck stopped out in the street. I went to O'Neil's truck and asked him where Maurice was. He told me to look back there and didn't I see the Schlotzky's (sic) sign. It took me awhile to see the sign and when I saw it I told him OK. I started walking to the sandwitch (sic) shop. I went inside the sandwitch (sic) shop and I went to the restroom. Maurice was in the restroom of the sandwitch (sic) shop when I got there. Maurice was using the restroom and then I used the restroom. We left together and walked past the jewelry shop and we didn't like what we saw because they had told us it usually be (sic) one person there and there was two. We walked over to Malcom's car in the parking lot by where the big building was. We were discussing about the two people being there. All three of us, me Malcom and Maurice were talking about it. I told Maurice whatever youre (sic) going to do, go on and do it because if youre (sic) not going to do nothing, we might as well go. Maurice say (sic) "let's go man." I walked back behind him to the jewelry store. Maurice had a white hankerchief (sic) in his hand and was fumbling with (sic) it because we were getting paranoid about going in. We went in the store together mostly. Maurice pulled out his grey color short pistol when we got to the counter. I told the men to stand up. I told the old man to stand up and Maurice told the other dude to stand up. Maurice said "Lay down" and the two men laid down on the floor behind the counter. I walked back to the corner of the room and looked out the window. Maurice walked around the counter and was watching them and he was looking at them (sic) envelopes and stuff. Maurice was putting envelopes in this little old box and when I turned my head the last time, to see that they was still laying down, the old man was raising up and trying to reach for something. Maurice had his back turned and I hollered Maurice's name out. I say (sic) "Watch it, he's got a gun." The old man had his hand between a little shelf like and I could see a little portion of a gun. Maurice turned around and he jumped back and fired a shot. I walked towards the door and I'm opening the door telling him to come on man and I hear a few more rounds. One round sounded like it came from a biger (sic) gun. I was almost acorss (sic) the street when Maurice came out the door. I told him to "come on man, you got to walk faster". We walked straight to Malcom's car and I got in the back seat and Maurice got in the front passenger side. Malcom drove off. Maurice and me was laying down in the seat when Malcom drove off. Maurice to (sic) Malcom we had to kill them and to come on. Malcom drove straight to his house in Pt. Arthur."

"... a confession may render sufficient circumstantial evidence that would be insufficient without it." *Watson v. State,* 227 S.W.2d 559, 562 (Tex.Cr.App.1950). See *White v. State,* 591 S.W.2d 851, 864 (Tex.Cr.App.1980); *Bridges v. State,* 362 S.W.2d 336 (Tex.Cr.App.1962). Testimony of Dr. LeBer established that Joe Granado died as a result of two shots fired at close range, with two different caliber bullets. Jewelry from Granado's Jewelry Store was found at the residence of two of the four participants in the robbery. The .38 used in the killing was also found. Louisa Morales worked next door to the jewelry store and heard two loud noises around 12:15 p.m., the time appellant confessed to robbing Granado. She saw two black men walk out of the jewelry store together right after the noises. Joy Moore saw two black men, one of whom she identified as appellant, standing near the jewelry store shortly after noon. She also noticed that the other man was holding a white handkerchief, something mentioned by appellant

in his confession. A white handkerchief was found on the counter in the jewelry store. The jury was charged on the law of parties.

These facts and circumstances taken in connection with the confession amply establish the offense and link appellant to it.

This ground of error is overruled.

Appellant asserts seven other grounds of error, most of which deal with the constitutionality and applicability of Art. 37.071, V.A.C.C.P.

Appellant contends that Art. 37.071(b)(2)[1] is unconstitutional as applied in the present case because the application of Art. 37.-071(b)(2) was so vague that it amounted to arbitrary and capricious punishment as prohibited in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Specifically appellant complains that the court permitted jurors to serve without giving them any proper definition of *probability* and the jurors own definitions, given during voir dire, reflect confusion.

■ We have repeatedly held that *probability* need not be defined because it is a word of common and ordinary meaning. *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr. App.1977); *Granviel v. State*, 552 S.W.2d 107, 117 (Tex.Cr.App.1977). Appellant argues that many jurors equated *probability* with "possibility" and "chance" and this reflected confusion and was not "close to a definition of 'probability'." First of all, we do not agree that the jurors were confused. The record reflects that most jurors were in fact in agreement that *probability* meant likely to repeat, and chance, in the sense that something similar might happen again. We cannot say they did not have a proper definition of *probability* since the term does not require a definition:

> 'Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such com-

mon words are not necessarily to be defined in the charge to the jury.'
*King*, supra, 553 at 107.

In addition defense counsel did not object to the prosecutor's voir dire or to the jurors' answers concerning *probability*, nor did appellant ever request any definition. Therefore, appellant may not now complain of an alleged unconstitutional application of Art. 37.071 in this case.

The ground of error is overruled.

■ Appellant contends that Art. 37.071 is unconstitutional because it does not allow a proportionality review to determine whether the penalty is proportionate to other similar crimes. This contention was addressed and overruled by the United States Supreme Court in *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

■ In his next ground of error appellant claims that Art. 37.071 is unconstitutional because it violates the equal protection and due process provisions of the United States Constitution because it is not based on a national uniform standard. Appellant contends that the United States Supreme Court should set a national standard. That court has consistently upheld the right of states to set their own standards within the limits imposed by the United States Constitution. See *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Pulley v. Harris*, supra.

This ground of error is overruled.

Appellant contends that Art. 37.071 is unconstitutional because Art. 37.071(d)(2) requires ten jurors to answer "no" to any special issue submitted on a death case in order to require a sentence of life imprisonment rather than death. Appellant claims that this puts an unconstitutional burden on a defendant and denies him equal protection because for every other crime in

---

**1.** Art. 37.071(b)(2): whether there is a probability that the defendant would commit criminal

acts of violence that would constitute a continuing threat to society.

Texas except capital murder any one "no" vote would be cause for mistrial.

■ Under Art. 37.071 as amended in 1981 and under which appellant was sentenced, if *one* juror votes "no" to a special issue and does not agree with the other jurors, the defendant is assessed the minimum punishment of life imprisonment. The defendant is not forced to face retrial and a possible death sentence. Thus, under the current Art. 37.071 a defendant in effect need only convince one juror to vote "no" in order to get the minimum punishment. We addressed a similar contention in *Molandes v. State,* 571 S.W.2d 3, 4 (Tex. Cr.App.1978) where we held that "the constitutional right to a unanimous verdict in felony cases extends only to the return of a verdict adverse to the accused, and ... the legislature may provide for the return of a verdict favorable to the accused on less than unanimous agreement." The provision *favors* a defendant because it "allows a favorable verdict resulting in life imprisonment to be returned on agreement of ten jurors," rather than force a defendant to "face the ordeal of a retrial and the possibility of a death-producing verdict by a new jury." *Molandes,* supra, at 4. See also *Brown v. State,* 554 S.W.2d 677 (Tex.Cr. App.1977).

The United States Supreme Court has expressly upheld Art. 37.071 as a specialized procedure utilized when the death penalty is involved. *Jurek v. Texas,* supra. Special issues such as the three in Art. 37.071 do not appear anywhere else in the statutes of Texas because, Art. 37.071 being the death penalty statute, and death being a penalty of special significance, special scrutiny and sentencing procedures are required. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Jurek,* supra. Art. 37.071 then in effect did not therefore violate the equal protection provision of the United States Constitution, and as mentioned, actually favors a defendant by not subjecting him to the ordeal of another trial and possible imposition of the death penalty.

This ground of error is overruled.

Next, appellant contends that the "court erred in allowing the jury and prospective jurors to be informed of the effect of their failure to agree on any special issue."

The prosecutor repeatedly told prospective jurors that if all the jurors vote "yes" to the special issues the court would assess death, but if one juror votes "no" to any of the special issues the court will assess punishment at life imprisonment.

Art. 37.071(d) states:

(d) The court shall charge the jury that:

(1) it may not answer any issue 'yes' unless it agree unanimously: and

(2) it may not answer any issue 'no' unless 10 or more jurors agree.

Art. 37.071(e) states:

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life. The court, the attorney for the state, or other attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article.

■ The prosecutor, by telling jurors that if one juror voted "no" the court would assess life, in effect told them the effect of failure to agree on an issue. However, appellant did not object to the prosecutor's statements. Nothing is preserved absent an objection. *Esquivel v. State,* 595 S.W.2d 516, 522 (Tex.Cr.App. 1980); *Cooper v. State,* 578 S.W.2d 401 (Tex.Cr.App.1979).

This ground of error is overruled.

Appellant contends, without specifying any part of the charge or of the statute, that the court's charge to the jury, apparently at the punishment phase, and Art. 37.071 violate the guidelines of *Lockett v. Ohio,* 438 U.S. 621, 98 S.Ct. 2954, 57 L.Ed.2d 1000 (1978) and the Eighth and

Fourteenth Amendments to the United States Constitution because they do "not clearly guide the jury in understanding mitigating circumstances and their purpose and of their option to recommend life imprisonment even though aggravating circumstances are found."

Appellant cites no cases and simply alleges very generally that the charge and statute are applied unconstitutionally. *Lockett* · indicated clearly that prior record and aspects of the character of the defendant are the type of mitigating factors that should be permitted. Art. 37.071 and case law that has developed under Art. 37.071 demonstrate that exactly those types of mitigating circumstances are admissible. *Ex parte Alexander,* 608 S.W.2d 928 (Tex. Cr.App.1980); *Milton v. State,* 599 S.W.2d 824 (Tex.Cr.App.1980); see cases following Art. 37.071, V.A.C.C.P.

■ Appellant previously complained of the fact that jurors were informed that a defendant would be assessed life imprisonment if only one of them voted "no" to any of the special issues. Now he seems to be complaining that they should be told in the charge of "their option to recommend life imprisonment." This clearly is not the law. The jury is supposed to consider all the evidence and answer the special issues based upon that evidence. The judge then assesses the punishment, depending upon the answers, at death or life. The jury charge in this case correctly instructed the jury on the law. Appellant did not request any additional charges. The special issues adequately guide the jurors in weighing the mitigating and aggravating circumstances presented by the evidence. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Lockett,* supra; *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr. App.1979); *Barefoot v. State,* 596 S.W.2d 875 (Tex.Cr.App.1980); *Blansett v. State,* 556 S.W.2d 322 (Tex.Cr.App.1977).

This ground of error is overruled.

In appellant's last ground of error he alleges ineffective assistance of counsel. He bases his claim upon four grounds; (1) the defense attorney's failure to request a definition of probability; (2) failure to submit questions as to the voluntariness of appellant's confession; (3) allegations that defense attorney failed to interview any witnesses prior to trial; and (4) failure to object to testimony that appellant was known to carry a gun.

■ The sufficiency and effectiveness of an attorney's assistance must be gauged by the totality of the representation of the accused to see that he has received reasonably effective assistance. *Ex parte Robinson,* 639 S.W.2d 953 (Tex.Cr.App.1982); *Passmore v. State,* 617 S.W.2d 682 (Tex.Cr. App.1981). The facts and circumstances of each case must be examined.

■ Appellant's first ground concerning failure to request a definition of *probability* is without merit. We have held that no definition of *probability* need by given. Therefore, failure to request such definition can hardly be called ineffective assistance of counsel. *King,* supra; *Granviel,* supra.

■ The second claim upon which appellant bases his ineffective assistance allegation is defense counsel's failure to object to the voluntariness of appellant's confession. Defense counsel filed a motion for a hearing on the voluntariness of the confession. The record reflects that the hearing was held and the court filed written findings of fact and conclusions of law stating that the confession was admissible and was voluntarily and freely given. In addition during the guilt-innocence stage of trial defense counsel objected again to the introduction of the statement.

■ Although this contention is somewhat unclear, appellant seems also to claim that defense counsel was ineffective because he failed to request a jury charge on the issue of voluntariness. We disagree. Even if defense counsel had requested a charge one need not have been given because no evidence was presented raising the issue.

■ Appellant's third allegation for the ineffective assistance claim is that defense

attorneys failed to interview any witnesses prior to trial. He cites one place in the record during the punishment phase where defense counsel made a motion for continuance in order to obtain two *new* witnesses to rebut a State's witness' testimony that apparently surprised appellant. Nowhere in the record is there any evidence of a failure to interview witnesses prior to trial. This claim is not supported by the record.

 Finally, appellant claims that defense counsel failed to object at the guilt-innocence stage to testimony that appellant was known to carry a gun and that that was why the police arrested appellant with their guns drawn. Even if defense counsel should have objected, this isolated failure to object is not error in light of the sufficiency of the overall representation. The totality of the representation over the course of the trial reflects that appellant received reasonably effective assistance.

This ground of error is overruled.

The judgment is affirmed.

TEAGUE, J., concurs in the result.

CLINTON, Judge, concurring.

I do not agree that special issues prescribed by Article 37.071, V.A.C.C.P. "adequately guide jurors in weighing the mitigating ... circumstances presented by the evidence," but the majority is obviously unwilling to provide such guidance. Accordingly, since to dissent is futile, I merely concur in the judgment of the Court.

MILLER, J., joins.