IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-75,200





CHELSEA LEA RICHARDSON, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 0929234A

IN THE 297TH JUDICIAL DISTRICT COURT 

TARRANT COUNTY




 Keasler, J., delivered the opinion for a unanimous Court. 


O P I N I O N



 On May 24, 2005, a jury convicted Chelsea Lea Richardson of a capital murder that 
was committed on December 11, 2003. (1) Based on the jury's answers to the special issues
set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial
judge sentenced Richardson to death. (2) Raising eight points of error, Richardson appeals the
trial court's judgment and death sentence. We conclude that Richardson's points of error are
without merit. Accordingly, we affirm the trial court's judgment and sentence of death.

Facts

 Richardson and her boyfriend, Andrew Wamsley, and their friend, Susan Toledano,
plotted to murder Andrew's parents, Rick and Suzanna Wamsley. The trio had a simple
motive--to divide the Wamsleys' substantial estate and insurance proceeds that Andrew
would inherit. The three conspirators contrived several plans and bungled two murder
attempts. On their third attempt, they killed the Wamsleys in a violent and bloody attack.

 At trial, fellow conspirator Toledano testified that she, Richardson, and Andrew had
devised several plans for killing the Wamsleys. The plans included staging a robbery where
the Wamsleys were killed, putting balloons filled with caustic chemicals in the gas tank of
the Wamsleys' vehicle, presumably to cause an explosion, cutting the vehicle's brake lines
to cause an accident, and shooting the vehicle while the Wamsleys were traveling in it,
which the conspirators believed would cause it to explode. The trio eventually settled on a
plan to travel alongside the Wamsleys' vehicle and shoot its gas tank with a gun they had
obtained from another friend, Hilario Cardenas. Andrew would drive while Toledano would
shoot, and Richardson would stay home to provide an alibi. But the plan proved
unsuccessful when, despite hitting the moving vehicle, it did not burst into flames as
expected but continued down the road. 

 Later, the trio made another attempt to murder the Wamsleys. According to
Toledano, she was to hide in Andrew's closet and shoot the Wamsleys after they went to
sleep. However, despite persistent encouragement from Richardson and Andrew as she
remained secreted, Toledano foiled the scheme by refusing to go through with the killings. 
The three regrouped and decided to try again another night.

 Toledano testified that she, Richardson, and Andrew returned as planned. Upon
entering the Wamsleys' home, Richardson encouraged Toledano to shoot Suzanna Wamsley
as she lay asleep on the living room couch, and Richardson even shoved Toledano into the
room to get her going. With this initial impetus, Toledano rushed Suzanna and shot her in
the head, killing her instantly. Immediately after, Toledano ran toward the Wamsleys'
bedroom and began firing at Rick Wamsley as he charged toward her, hitting him in the right
temple. Unrelenting, Rick forced Toledano back into the living room and fell on top of her,
causing her to drop the gun. As the two struggled, Andrew intervened, trying to force
Rick--his own father--off of Toledano, and Richardson joined the fray by shooting Rick
in the back. Eventually, the trio stood facing Rick, who was still alive, as he sat on the floor. 
While Rick pleaded to know why all of this was happening, Richardson thrust a knife she
had taken from the kitchen at him, stabbing his hand as he tried to block the attack. Soon
after, Toledano stabbed him in the back with another kitchen knife as he lay on the ground. 
Rick Wamsley died, and the three left.

Sufficiency of the Evidence


 In points of error one through three, Richardson challenges the sufficiency of the
evidence. She alleges that the State failed to meet its burden by introducing insufficient
evidence at trial, both legally and factually, to support her conviction. She also challenges
the trial judge's denial of her motion for directed verdict. Because a challenge to a trial
judge's decision to overrule a motion for a directed verdict presents an attack to the legal
sufficiency of the evidence, (3) we will review the trial judge's ruling while considering the
legal sufficiency of the evidence.

 To find Richardson guilty, the jury had to believe that the State had proven beyond
a reasonable doubt that Richardson intentionally caused the Wamsleys' deaths during the
same criminal transaction. (4) The jury was authorized to convict Richardson either as a
principal or as a party to their murders. (5) 

 In deciding whether the evidence is legally sufficient to sustain a conviction, we must
determine "whether, after viewing the evidence in the light most favorable to the verdict,
any rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt." (6) "The jury is the exclusive judge of the credibility of witnesses and of
the weight to be given their testimony." (7) Additionally, "reconciliation of conflicts in the
evidence is within the exclusive province of the jury." (8) In short, if any rational juror could
have found the elements to have been proven beyond a reasonable doubt, we will not disturb
the verdict on appeal. (9) 

 In deciding whether the evidence is factually sufficient to sustain a conviction, we
will assume that the evidence is legally sufficient, but we will view "all of the evidence in
the record without the prism of 'in the light most favorable to the verdict.'" (10) That is, rather
than just viewing the evidence that supports the verdict, we will review the evidence that
tends to prove the existence of the elemental fact in dispute as compared to the evidence that
tends to disprove that fact. (11) In reviewing factual sufficiency, then, we may disagree with
the jury's verdict, even if probative evidence exists that supports it, but we will set the jury's
verdict aside only if it is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust. (12) "Examples of such a wrong and unjust verdict include instances
in which the jury's finding is 'manifestly unjust,' 'shocks the conscience,' or 'clearly
demonstrates bias.'" (13) 

 Regarding legal sufficiency, viewed in the light most favorable to the verdict, the
testimony and evidence at trial showed that Richardson participated in the planning of the
murders, aided in the two failed attempts to murder the Wamsleys, and was present during,
encouraged, and participated in the final attempt during which the Wamsleys were killed. 
Toledano testified that she heard Richardson planning the murders with Andrew and that
Richardson went with her and Andrew on the night that the Wamsleys were killed. 
Toledano further testified that Richardson encouraged her to kill the Wamsleys while in the
Wamsleys' home and that Richardson physically shoved her into the living room to get her
going. Her testimony also indicated that Richardson shot Rick Wamsley in the back and
stabbed him. Corroborating Toledano's testimony, two witnesses who had been incarcerated
at the county jail with Richardson testified that Richardson admitted to participating in the
murders and to shooting Rick Wamsley. Testimony also revealed that Richardson asked
another friend, who was mentally challenged, to provide her with an alibi for the night of the
murders and that she even convinced this same friend to lie to the grand jury investigating
the murders. 

 The jury is the sole judge of the weight and credibility of witness testimony, (14) and as
we have held, "Evidence is sufficient to support a conviction under the law of parties where
the actor is physically present at the commission of the offense and encourages the
commission of the offense either by words or other agreement." (15) Given all of the evidence
presented at trial, any rational trier of fact could have found beyond a reasonable doubt that
Richardson intentionally caused the Wamsleys' deaths in the same criminal transaction. The
evidence supporting the conviction is legally sufficient. Further, because the evidence is
legally sufficient, the trial judge did not err in denying Richardson's motion for directed
verdict. We therefore overrule Richardson's first and second points of error. 

 Regarding factual sufficiency, Richardson argues that most of the evidence indicating
that she participated in the murders came from the testimony of Toledano, an accomplice
who struck a deal with the State for a life sentence in exchange for her testimony. She
claims that Toledano's testimony is not reliable because of the varying version of events that
Toledano had given to the police, to the grand jury, and to the jury at trial. As a result, she
contends that we can have no confidence in the jury's verdict. Richardson also urges us to
require independent corroboration of the jailhouse-informant testimony like that required
of accomplice-witness testimony. (16) She argues that there was no such corroboration here
and asks us to discount the jailhouse-informant testimony that Richardson admitted to
participating in the murders and to shooting Rick Wamsley.

 As we indicated above, the jury is the sole judge of the weight and credibility of
witness testimony, and reconciliation of conflicts in the evidence is within its exclusive
province. (17) The jury could believe or not believe any testimony presented at trial and could
assign to the testimony whatever weight it wished. The jury listened to Toledano's
testimony and that of the jailhouse informants, and defense counsel pointed out on cross-examination reasons why the testimony should not be believed. Due deference must be 
accorded to the jury regarding the weight and credibility of the evidence, and we see no
reason to conclude that the jury's verdict is manifestly unjust, shocks the conscience, or
clearly demonstrates bias. The jury's finding that Richardson intentionally killed the
Wamsleys during the same criminal transaction is not so contrary to the overwhelming
weight of the evidence as to be clearly wrong or unjust. The evidence supporting
Richardson's conviction is factually sufficient; therefore, we overrule her third point of error.
Erroneously Admitted Testimony

 In point of error six, Richardson contends that the trial judge erred in overruling her
objections to a portion of Kathryn Norton's testimony. Norton, who had been housed in the
Tarrant County Jail with Richardson, testified how she was able to contact the District
Attorney's Office through her father to reveal admissions Richardson had made implicating
herself in the murders. On direct examination, the following exchange took place between
Norton and the prosecutor: 

 [Prosecutor]: Were you revoked on that probation?

 [Norton]: Yes.

 [Prosecutor]: And where were you sent?

 [Norton]: I was sent to Tarrant County.

 [Prosecutor]: Then where were you sent after that?

 [Norton]: To Dawson State Jail.

 [Prosecutor]: At that time when you were in Dawson State Jail, did
you make contact with the District Attorney's office?

 [Norton]: My dad actually did.

 [Prosecutor]: And why did your dad?

 [Norton]: He told my lawyer about what --

 [Defense Counsel]: Objection as to hearsay as to what her father said.

 [Trial Court]: Well, I'm gonna overrule that particular objection at this
time.

 [Defense Counsel]: I make a 403 objection to her statement then, Judge.

 [Trial Court]: Overruled.

 [Defense Counsel]: What her father says, it's a 403 issue.

 [Trial Court]: Overruled. The State may continue to ask the questions.

 [Prosecutor]: You can answer that question.

 [Norton]: My dad told my lawyer that -- what happened to me in
jail and that I was with somebody who did something
bad, and my lawyer went to you guys.

 [Prosecutor]: Did your dad do that because he received something in
the mail?

 [Norton]: Yes.

 [Prosecutor]: What did he receive in the mail?

 [Norton]: He received a letter from Chelsea.

 In arguing her sixth point of error, Richardson does not attack the heart of Norton's
testimony regarding the admissions Richardson had made. Rather, Richardson only argues
that some of Norton's testimony concerning how she was able to contact the District
Attorney's Office was introduced in violation of Rule 802 (hearsay) and Rule 403
(exclusion of relevant evidence) of the Texas Rules of Evidence. Even assuming that the
challenged statement was inadmissible and was erroneously admitted, such a breach of the
evidentiary rules does not raise constitutional concerns and must be disregarded unless the
erroneously admitted testimony affected Richardson's substantial rights. (18) Here, we
conclude that Richardson's substantial rights were not affected.

 Substantial rights are not affected by the erroneous admission of evidence "if the
appellate court, after examining the record as a whole, has fair assurance that the error did
not influence the jury, or had but a slight effect." (19) In assessing the likelihood that the jury's
decision was adversely affected by the error, we "consider everything in the record,
including the testimony and physical evidence admitted, the nature of the evidence
supporting the verdict, the character of the alleged error, and how it might be considered in
connection with other evidence in the case." (20) We may also consider voir dire, jury
instructions, closing arguments, the State's theory, any defensive theories, whether the
testimony was elicited from an expert, whether the testimony was cumulative, and whether
the State emphasized the error. (21)

 A review of the record as a whole reveals that the challenged bit of Norton's
testimony can be characterized only as insignificant and non-contributing to Richardson's
conviction and death sentence. It did not concern the substance of Norton's testimony
regarding Richardson's admissions and was never referenced by the State at any other time
in the trial. Indeed, it occupies only one sentence of the thirty-two-volume reporter's record
taken during the six-day trial. The only portion that may even be viewed as potentially
damaging is the phrase intimating that Richardson was "somebody who did something bad." 
But considering this statement against the entirety of the record, including fellow conspirator
Toledano's testimony detailing Richardson's planning, involvement, and execution of the
murders, testimony that Richardson had twice admitted to involvement in the murders,
testimony that Richardson had admitted to shooting and stabbing Rick Wamsley, testimony
that Richardson asked a mentally challenged friend to provide her with an alibi for the night
of the murders, and testimony that Richardson also convinced this same friend to lie to the
grand jury investigating the murders, we cannot conclude that the challenged testimony,
even assuming it was erroneously admitted, affected Richardson's substantial rights. 
Richardson's sixth point is therefore overruled. Constitutionality of Death-Penalty Scheme

 In point of error four, Richardson contends that the trial judge erred in failing to grant
her motion to preclude the imposition of the death penalty. Citing to Ring v. Arizona (22) and
Apprendi v. New Jersey, (23) Richardson argued that the Fifth and Fourteenth Amendments
require the grand jury to allege the special issues in the indictment before the State can seek
the death penalty. We have already rejected this same argument. (24) Point of error four is
overruled.

 In point of error five, Richardson contends that the trial judge erred in overruling her
motion to instruct the jury that the State has the burden of proof to demonstrate beyond a
reasonable doubt that there was an absence of sufficient mitigation evidence to warrant a life
rather than death sentence. She alleged that such an instruction is required under the Fifth,
Sixth, and Fourteenth Amendments to the United States Constitution. We have already
rejected this same argument. (25) Point of error five is overruled.

 In point of error seven, Richardson maintains that the trial judge erred in denying her
motion to declare the Texas death-penalty statute unconstitutional under the Fifth, Eighth,
and Fourteenth Amendments. Richardson argued in her motion that the term "probability"
as used in the future-dangerousness special issue requires the jury to engage in a "vague and
indefinite inquiry" utilizing a statute that is "incapable of interpretation by reasonable men." 
Richardson further complained that the statute "provides no guidelines or other statutory
limitations" concerning whether there is a probability that she would commit criminal acts
of violence that would constitute a continuing threat to society. (26) We have already rejected
this and similar arguments. (27) Point of error seven is overruled.

 Richardson contends in point of error eight that the use of a chemical substance
pancuronium bromide to carry out her execution violates the Eighth Amendment's
prohibition against the infliction of cruel and unusual punishment. Richardson's execution
is not imminent, however, and the method in which the lethal injection is currently
administered is not determinative of the way it will be administered at the moment of
Richardson's execution. Thus, this claim is not ripe for review. (28) Point of error eight is
overruled.

Conclusion 

 Based on the foregoing, we affirm the judgment of the trial court.


DELIVERED: January 23, 2008

DO NOT PUBLISH
1. Tex. Penal Code Ann. § 19.03(a)(7) (Vernon 2003).
2. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(g) (Vernon Supp. 2003). 
3. McDuff v. State, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997).
4. See Tex. Penal Code Ann. § 19.03 (a)(7)(A). 
5. See Tex. Penal Code Ann. § 7.01 (Vernon 2003). 
6. Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); Jones v. State,
944 S.W.2d 642, 647 (Tex. Crim. App. 1996). 
7. Jones, 944 S.W.2d at 647.
8. Id. 
9. Id. 
10. Id. at 647 (citing Clewis v. State, 922 S.W.2d 126, 131-32 (Tex. Crim App. 1996));
see also Watson v. State, 204 S.W.3d 404, 405, 414-17 (Tex. Crim. App. 2006). 
11. Jones, 944 S.W.2d at 647.
12. Id. at 647-48.
13. Id. at 648 (citing Clewis, 922 S.W.2d at 135).
14. Ortiz v. State, 93 S.W.3d 79, 88 (Tex. Crim. App. 2002).
15. Burdine v. State, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986). 
16. See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005), added by Acts 1965,
59th Leg., ch. 722, eff. Jan. 1, 1966.
17. Ortiz, 93 S.W.3d at 88; Jones, 944 S.W.2d at 647. 
18. Russell v. State, 155 S.W.3d 176, 181 (Tex. Crim. App. 2005); Tex. R. App. P.
44.2(b) (Vernon 2003). 
19. Solomon v. State, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). 
20. Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). 
21. Id.; Motilla v. State, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002); Solomon, 49
S.W.3d at 365; King v. State, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997).
22. 536 U.S. 584 (2002).
23. 530 U.S. 466 (2000).
24. See Russeau v. State, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005). 
25. See Hankins v. State, 132 S.W.3d 380, 386 (Tex. Crim. App. 2004). 
26. See Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1). 
27. See Druery v. State, 225 S.W.3d 491, 509-10 (Tex. Crim. App.), cert. denied, 169
L. Ed. 2d 404 (Nov. 13, 2007) (citing King v. State, 553 S.W.2d 105, 107 (Tex. Crim. App.
1977)). 
28. See Gallo v. State, No. AP-74,900, 2007 Tex. Crim. App. LEXIS 1234, at *54
(Tex. Crim. App. Sept. 26, 2007).