IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-74,912





MARCUS DRUERY, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. 03-0001-CRF-85

IN THE 85TH JUDICIAL DISTRICT COURT 

BRAZOS COUNTY




 Keasler, J., delivered the opinion of the Court, in which Meyers, Price, Womack,
Hervey, Holcomb, and Cochran JJ., joined. Johnson, J., concurred in point of error
fourteen and otherwise joined the opinion of the Court. Keller, P.J., filed a concurring
opinion. 


O P I N I O N



 In December 2003, a jury convicted Marcus Druery of a capital murder committed on
October 31, 2002. (1) Based on the jury's answers to the special issues set forth in Texas Code
of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced
Druery to death. (2) Direct appeal to this Court is automatic. (3) After reviewing Druery's 
twenty-one points of error, we find them to be without merit. Accordingly, we affirm the
trial court's judgment and sentence of death.

Statement of Facts

 On October 30, 2002, Druery went to Skyyler Browne's apartment on the Texas State
Technical College campus in Waco where both were students. Browne was commonly
known by his nickname "Rome." Druery asked Rome to travel with him to Bryan; Rome
hesitated but eventually agreed to go. Rome, who was known to have sold marijuana, took
his cell phone, $400 to $500, his gun, and some marijuana. No one at the school ever saw
him again. Druery later told a Texas Ranger that, after he and Rome had traveled from Waco
to Bryan, they partied into the night, but Rome wanted to go home. Druery recounted to the
Ranger that Rome called a girlfriend, and the girlfriend picked him up from the Contiki Club
in an orange Cadillac. Law enforcement, however, was never able to locate an orange
Cadillac.

 Joquisha Pitts and Marcus Harris told a different story. Pitts was Druery's former
girlfriend, and Harris was Druery's younger friend who was still in high school. Pitts
recounted at trial that she had known Rome for only a couple of days when she witnessed his
murder. She accompanied Druery and Rome to the Contiki Club, and on the way, the group
picked up Harris, as well as some ecstasy tablets and some embalming fluid, which is put on
cigarettes and smoked to produce a high. Harris recounted at trial that this was his first
meeting with Rome. Around 1:00 to 1:30 a.m., at Druery's suggestion, Druery, Rome, Pitts,
and Harris left the Contiki Club to go to rural property owned by the Druery family. Pitts
drove Druery's car as Druery navigated because she had never been there before. Neither
Pitts nor Harris was aware of Druery's plans.

 During the drive to the country, Druery claimed that someone was following them,
and he repeatedly asked Rome for his gun so he could shoot whomever it was. Rome
refused. Once at the property, Druery unlocked the gate and drove the group the rest of the
way to a stock pond. Using the vehicle's headlights for illumination, each member of the
group took turns shooting Rome's gun at bottles they had thrown into the water. At this time,
Druery called Pitts to the car and told her he was going to kill Rome, saying he wanted
Rome's "stuff." Pitts reminded Druery that Druery had a two-year-old son, and she
ultimately believed that Druery was "just playing."

 After he shot the gun, Druery claimed that the ammunition had run out, and he
returned to the driver's seat of the car. Pitts saw that Druery was taking bullets from the car's
console, wiping them clean with a rag, and placing them in the pistol's magazine. Druery
then called Harris to the vehicle, telling him that he planned to shoot Rome, but Harris
believed that Druery was "tripping" on embalming fluid that he had smoked. Druery then
ordered both Pitts and Harris to sit in the car. 

 Standing near the pond, Rome pulled his jacket or a hood over his head to block the
wind as he attempted to light a pipe or cigar filled with marijuana. Druery skulked toward
Rome under the cover of darkness, held the gun within six inches of Rome's head, and fired. 
As Rome's body fell, Druery fired a second shot into Rome's neck, and then he fired a third
shot into Rome's body as it lay on the ground. Pitts and Harris began to cry and scream, and
both saw Druery kneel over Rome's body. Druery returned to the vehicle with Rome's
cellular phone, money, marijuana, and gun. He attempted to calm his hysterical companions
by giving each forty dollars.

 Soon thereafter, Druery obtained some gasoline (perhaps with Harris's assistance) and
poured it on Rome's body. He set it ablaze, and the three left as the body burned. During
the drive, Druery instructed Pitts and Harris on how to respond to questions about Rome. He
told them to say that Rome's girlfriend picked him up in an orange Cadillac to take him to
get his sister in Washington D.C. and that they didn't see him again. The next day, Druery
returned to the pond with Pitts and two others, burned the body a second time, and threw the
body into the pond. Later, Harris assisted Druery in disposing of the murder weapon. 

 Pitts eventually went to the police and told them that she was scared and wanted to
get it off her chest. Harris told authorities that he thought he would die because he believed
Druery would not want to leave any witnesses to the killing. 

Accomplice Witness Testimony

 Druery's points of error one through nine are related. In points of error one and three,
Druery asserts that the evidence is insufficient to prove that he committed the underlying
predicate felony offense of robbery during the course of the commission of murder. He
argues that the only evidence he committed robbery came from two witnesses, Pitts and
Harris, whom he maintains were accomplice witnesses as a matter of law. He then reasons
that because of the witnesses' status as accomplices, the accomplice witness rule, (4) which
requires corroboration of an accomplice's testimony by other non-accomplice evidence that
tends to connect the defendant to the charged offense, also requires that the testimony of Pitts
and Harris concerning the underlying robbery be corroborated. Druery contends that such
corroborating evidence concerning the underlying robbery is wholly lacking.

 In point of error two, Druery urges us to overrule our previous holding in Holladay
v. State (5) that the accomplice witness rule does not require the non-accomplice testimony to
corroborate a defendant's connection to the specific element that raises the offense from
murder to capital murder. Here, the specific element is the underlying robbery, which Druery
claims in points of error one and three is not corroborated by non-accomplice witness
evidence. In points of error four and five, Druery contends that the trial judge erred when
he refused to instruct the jury that Pitts and Harris were accomplices as a matter of law. In points of error six and seven, Druery contends that the trial judge's instruction to
the jury regarding whether Pitts and Harris were accomplice witnesses as a factual matter was
constitutionally inadequate. He argues that the instruction failed to provide sufficient
guidance to allow the jury to reliably ascertain the witnesses' status. And in points of error
eight and nine, Druery argues that the trial judge's instruction allowing the jury to determine
whether Pitts and Harris were accomplice witnesses as a factual matter constituted an
improper comment on the weight of the evidence.

 All of these claims rest upon the threshold issue of whether Pitts and Harris were
accomplices--either as a matter of law or of fact--to the capital murder or a lesser-included
offense of the capital murder. If they are not accomplices, then there is no error in the trial
judge's refusal to instruct the jury that the witnesses were accomplices as a matter of law. 
Also, if Pitts and Harris are not accomplices, then the trial judge's instruction regarding
accomplice witnesses as a matter of fact was superfluous and did not harm Druery. Indeed,
such an instruction could only benefit him because it allowed the jury to require
corroboration of the witnesses' testimony if it believed that the witnesses were accomplices
to Rome's murder.

 Similarly, if Pitts and Harris are not accomplices, then the superfluous accomplice
witness instruction as a factual matter in this case cannot be considered an improper
comment on the weight of the evidence. Again, the instruction could only benefit Druery by
requiring additional corroborating evidence that would otherwise not be required. Last, if
Pitts and Harris are not accomplices, then a review to determine whether non-accomplice
evidence sufficiently corroborated their testimony is not applicable, and there is no need to
review whether this Court's decision in Holladay concerning accomplice witness
corroboration of the underlying predicate felony should be overturned. We find that Pitts and
Harris were neither accomplices as a matter of law nor accomplices as a matter of fact.

 Texas law requires that, before a conviction may rest upon an accomplice witness's
testimony, that testimony must be corroborated by independent evidence tending to connect
the accused with the crime. (6) This accomplice witness rule creates a statutorily imposed
review and is not derived from federal or state constitutional principles that define the legal
and factual sufficiency standards. (7) An accomplice is someone who participates with the
defendant before, during, or after the commission of a crime and acts with the required
culpable mental state. (8) To be considered an accomplice witness, the witness's participation
with the defendant must have involved some affirmative act that promotes the commission
of the offense with which the defendant is charged. (9) A witness is not an accomplice witness
merely because he or she knew of the offense and did not disclose it, or even if he or she
concealed it. (10) In addition, the witness's mere presence at the scene of the crime does not
render that witness an accomplice witness. (11) And complicity with an accused in the
commission of another offense apart from the charged offense does not make that witness's
testimony that of an accomplice witness. (12) In short, if the witness cannot be prosecuted for
the offense with which the defendant is charged, or a lesser-included offense of that charge,
the witness is not an accomplice witness as a matter of law. (13)

 A trial judge, therefore, has no duty to instruct the jury that a witness is an accomplice
witness as a matter of law unless there exists no doubt that the witness is an accomplice. (14) 
For instance, the instruction is appropriate when the witness is charged with the same offense
as the defendant or a lesser-included offense or when the evidence clearly shows that the
witness could have been so charged. (15) If the evidence presented by the parties is conflicting
and it remains unclear whether the witness is an accomplice, the trial judge should allow the
jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact
under instructions defining the term "accomplice." (16) However, as with an accomplice as a
matter of law, there must still be some evidence of an affirmative act on the part of the
witness to assist in the commission of the charged offense before such an instruction is
required. (17)

 Here, neither Pitts nor Harris was an accomplice as a matter of law or as a matter of
fact. Neither witness was indicted for the capital murder or a lesser-included offense of the
capital murder, and the evidence does not show that the witnesses could have been so
charged. A review of the record reveals that testimony was elicited regarding the actions of
Pitts and Harris before, during, and immediately after the murder as follows: (1) when
Druery, Pitts, Harris, and Rome left the Contiki Club around 1:00 a.m., Druery decided to
go to his father's property; (2) although Pitts drove the car, she had never been to this
property before; Druery gave her directions; (3) when the group began the drive to the
country, Pitts had no idea what Druery was going to do; (4) before he shot Rome, Druery told
Pitts that he was going to kill Rome; (5) Druery also told Harris, "Right now I'm going to kill
this nigger, this dude"; (6) Pitts reminded Druery that he was responsible for taking care of
his two-year-old son, but Druery responded by stating, "So, I want his stuff"; (7) Pitts
thought to herself that Druery was "just playing" when he threatened to kill Rome; (8) Harris
thought that Druery was "tripping" on the embalming fluid that he had smoked; (9) Druery
waited until Rome had his jacket over his head to block the wind before putting the gun
about six inches from Rome's head and shooting him; (10) immediately after he killed Rome,
Druery went through Rome's pockets and came back to the vehicle with Rome's cell phone,
gun, marijuana, and money; (11) Pitts started crying after she witnessed the shooting; (12)
Druery told Pitts, immediately after shooting Rome, that he "shouldn't have done this in front
of us"; (13) immediately after he murdered Rome, Druery asked Pitts and Harris if they were
all right and attempted to calm them down; (14) Harris lied to Druery and told him that he
was all right; (15) Harris thought he was going to die because he believed that Druery would
not want to leave any witnesses to the murder; (16) Druery asked Pitts and Harris if they
wanted any money, and neither Pitts nor Harris replied; Druery gave forty dollors to each of
them; (17) after the murder, Druery told Angela Minor, an acquaintance of his, "I killed
somebody"; Druery explained to Minor that he and the others were out at the trailer where
he used to live and they were shooting a gun; he stated that he made two people that were
with him go back to the car and sit; he then relayed that while Rome had his back turned to
him, he shot Rome; he said that the two people with him when he shot Rome were Pitts and
Harris; (18) after the murder, Druery told Lakeisha Green, another acquaintance of his, that
Rome had been trying to light a cigarette and had placed his jacket over his head to block the
wind; at that time, Druery stated, he called out, "Say Rome," and Rome replied "What?" to
him; Druery then shot Rome in the head; Druery also told Green that when he shot Rome,
Pitts and Harris ran to the car screaming.

 This evidence does not indicate that either Pitts or Harris performed any affirmative
act to assist in the commission of the capital murder or a lesser-included offense of the
capital murder, so, it does not show that either witness was an accomplice as a matter of law
or an accomplice as a matter of fact. Still, Druery points to several facts that he believes
indicate that Pitts and Harris were accomplices: (1) both Pitts and Harris were present prior
to and during the murder; (2) neither warned Rome that Druery had said that he intended to
kill Rome; (3) there was evidence that both witnesses may have distracted Rome's attention
before the shooting; (4) Harris assisted in the disposal of the body and the gun after the
murder; and (5) Pitts and Harris received forty dollars each after the murder. Apart from the
allegation that the witnesses may have distracted Rome, none of these acts rise to the level
of an affirmative act to assist in the commission of the capital murder or a lesser-included
offense of the capital murder. 

 The mere presence of Pitts and Harris at the scene of the crime does not render either
an accomplice witness, and neither Pitts nor Harris is an accomplice witness merely because
he or she knew of the planned offense but did not disclose it. (18) More importantly, the
testimony itself reveals that neither Pitts nor Harris believed Druery was actually going to kill
Rome. Pitts believed Druery was "just playing," and Harris thought Druery was "tripping"
on embalming fluid. Additionally, nothing in the record shows that either Pitts or Harris
distracted Rome to help facilitate his murder. To the contrary, the record indicates that
Druery later told Angela Minor that he made Pitts and Harris "go back to the car and sit"
before shooting Rome in the head.

 As for the argument that Harris assisted in the disposal of the body and the gun after
the murder, we have previously held that merely assisting after the fact in the disposal of a
body does not transform a witness into an accomplice witness in a prosecution for murder. (19) 
The witness must still be susceptible to prosecution for the murder itself by having
affirmatively assisted in committing the offense. (20) This same logic applies to assisting
Druery in disposing of the gun after the murder; the fact that Harris did so does not make him
an accomplice witness to the capital murder. Finally, the fact that both Pitts and Harris
received forty dollars after the murder does not transform either witness into an accomplice
witness. The record shows that neither requested the money nor did either respond
affirmatively when asked about wanting the money. It is reasonable to infer that Druery gave
Pitts and Harris the money in an attempt to calm them after the murder because they were
crying and screaming. 

 In short, none of the evidence presented at trial indicates that either Pitts or Harris was
an accomplice as a matter of law or as a matter of fact. Therefore, we will not review their
testimony through the lens of the accomplice witness rule to determine if sufficient non-accomplice corroborating evidence was introduced at trial. Likewise, Druery's arguments
concerning accomplice witness instructions given to or not given to the jury and concerning
the application of the accomplice witness rule to the underlying predicate felony offense are
inapposite. Points of error one through nine are overruled.

Admission of Letter Into Evidence


 In related points of error ten, eleven, and twelve, Druery challenges State's Exhibits
116A, 116B, and 116C, which were admitted into evidence by the State at punishment to
rebut Druery's evidence of good character. Exhibit 116A is a letter purportedly written by
Druery and Exhibit 116C is the letter's envelope; Exhibit 116B is a copy of the letter and the
envelope that was made before the original Exhibits 116A and 116C were damaged in the
process of extracting latent finger prints from them. The letter contains admissions by
Druery concerning his violent acts and indicates a lack of remorse for Rome's murder. 

 In point of error eleven, Druery argues that the trial judge erred in admitting the
exhibits because they were not sufficiently authenticated. In point of error ten, he alleges that
the trial judge erred in admitting the exhibits because the chain of custody was broken,
rendering the exhibits irrelevant. In point of error twelve, Druery claims that the trial judge
erred in failing to instruct the jury that it must make a handwriting comparison to determine
if the letter was written by him. We find that the exhibits were properly admitted into
evidence and that the lack of an instruction to make a handwriting comparison was not error.

 The letter in question was initially mailed from the Brazos County jail to Jamesia
Idlebird, but was returned due to insufficient postage. The return address written on the
envelope identifies Ronnie Taylor, another inmate at the jail, rather than Druery as the sender
and lists the address for the jail as the sender's address. By the time the letter was returned
to the jail, Idlebird had been arrested and was also incarcerated there. The returned letter was
intercepted by jail staff for security reasons because it was addressed from one inmate to
another. Jail staff forwarded the letter to the jail administrator, who forwarded it to the chief
deputy of the sheriff's department. The chief deputy then delivered the letter to Kenny
Elliott, an investigator with the sheriff's office working on Druery's case. Elliot received the
letter the day after general voir dire had begun. Only Elliot testified at punishment regarding
how the letter was intercepted. 

 The letter itself consists of five handwritten pages and five pages of attachments. The
attachments are copies of the first page of the typewritten transcriptions of police interviews
with LaKeisha Green, Charles Kennard, Marcus Harris, Joquisha Pitts, and Chasiti Hall. In
the first handwritten page, the writer identifies himself as "Marky D," Druery's nickname,
and identifies Green, Kennard, Harris, Pitts, and Hall as snitches. Each of these witnesses
subsequently testified for the State at the guilt stage of the trial, and Idlebird testified as a
State witness during punishment. The writer explains in the letter that he was forwarding
only the first pages of the transcribed interviews because he had to study the remaining
portions to prepare for trial. The writer also explains that he had to put a different name as
the sender in the return address in an attempt to circumvent inspection by jail authorities. 

 A latent fingerprint examiner testified that eleven fingerprints on the exhibits
belonged to Druery. These latent prints were located on three of the handwritten pages and
one of the typewritten interview pages. The examiner also testified that four other latent
fingerprints found on the letter did not match Druery's fingerprints. Druery objected to the
admission of the letter on the ground that it was not properly authenticated and on the ground
that the chain of custody was not properly established. He did not request an instruction for
the jury to conduct a handwriting comparison, nor did he object to the trial court's failure to
include an instruction regarding Texas Code of Criminal Procedure Article 38.27, which
concerns evidence of handwriting.

A. Authentication

 We first address Druery's claim that State's Exhibits 116A, 116B, and 116C were not
properly authenticated and should not have been admitted into evidence. As the evidentiary
rules state, "Preliminary questions concerning . . . the admissibility of evidence shall be
determined by the court (21) [and] [w]hen the relevancy of evidence depends upon the
fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction
of evidence sufficient to support a finding of the fulfillment of the condition." (22)

 Whether a conditional fact has been proven is a question for the jury, and the trial
judge's role is limited to determining whether there is sufficient evidence to support such a
finding. (23) In other words, the trial judge should admit evidence that is relevant based upon
a conditional fact only if there is sufficient evidence to support a jury finding that the
conditional fact is true. Indeed, "[t]he requirement of authentication or identification as a
condition precedent to admissibility is satisfied by evidence sufficient to support a finding
that the matter in question is what the proponent claims." (24) This authentication requirement
can be satisfied by showing "Distinctive characteristics and the like: Appearance, contents,
substance, internal patterns, or other distinctive characteristics, taken in conjunction with
circumstances." (25) The trial judge does not abuse his or her discretion in admitting evidence
where he or she reasonably believes that a reasonable juror could find that the evidence has
been authenticated or identified. (26)

 The issue before us, then, is whether the trial judge abused his discretion by admitting
the letter and its envelope into evidence. To resolve this issue, we must determine whether
it was an abuse of discretion for the trial judge to find that sufficient evidence was presented
to support a jury finding that Druery wrote the letter. (27) We will affirm the trial judge's
decision as long as his or her ruling is within the zone of reasonable disagreement. (28) Here,
the evidence in question was properly authenticated because the letter and envelope
contained sufficient distinctive internal characteristics to support a finding that Druery was
the author of the letter. 

 First, the letter was returned to the Brazos County jail while Druery was an inmate
there on or about November 4, 2003. Even though the envelope does not have a postmark
and the letter itself is undated, it is reasonable to infer that it was mailed after February 7,
2003, the latest date indicated on the transcribed interview pages enclosed with the letter. 
Druery had remained in custody since his arrest date on November 14, 2002, and was in
custody at the jail from the earliest possible date the letter could have been mailed until it was
recovered. This evidence establishes that Druery was in a position to mail the letter from the
jail.

 Second, the writer of the letter identifies himself as Druery. The top of the first page
of the handwritten portion of the letter states, "This is Marky D," and the letter is closed on
the last handwritten page, "Marky D a/k/a lil dip." The evidence at trial showed that Druery
is known as "Marky D."

 Third, the letter was sent to Idlebird, Druery's cousin and a witness in his case. 
Fourth, the content of the letter identifies five witnesses, all of whom had given statements
to the police and were going to testify for the State against Druery. The writer identifies all
of these witnesses as snitches. Fifth, the letter includes the cover page of transcribed
interviews with each of the witnesses the writer identifies as snitches. It is therefore
reasonable to infer that Druery had access to these transcriptions. Sixth, the handwritten
letter discusses facts known to Druery regarding his case, including statements that Pitts and
Harris had witnessed the murder and talked with police. Seventh, the author writes that the
return address had a different name than the true sender because the true sender was
attempting to avoid having the letter read by jail staff. Eighth, eleven of Druery's
fingerprints were positively identified as being on the letter or on the attached transcriptions. 

 Druery did not present any evidence of tampering or other fraud regarding the letter.
So while Druery is correct that a possibility does exist that another person knew and had
access to all of this information as well as blank pages containing Druery's fingerprints upon
which to write the letter, it was reasonable for the trial judge to believe that a reasonable juror
could find that the exhibit was what the State purported it to be--a letter written by Druery. 
The letter was properly authenticated, and the trial judge's decision to admit the letter was
not an abuse of discretion. Point of error eleven is overruled.

B. Chain of Custody

 Next, Druery complains that the chain of custody for the exhibits was not established
because Investigator Elliot did not personally seize the letter and envelope in question. He
asserts that under the circumstances, there was no chain of custody connecting the writing
of the letter to Druery.

 A trial judge has great discretion in the admission of evidence at trial, (29) and although
the evidentiary rules do not specifically address proper chain of custody, they do state that
identification for admissibility purposes is satisfied if the evidence is sufficient to support a
finding that the matter in question is what its proponent claims. (30) As stated above, there was
sufficient evidence before the trial judge to support the finding that Druery authored the letter
in question. Absent evidence of tampering or other fraud, which has not been presented here,
problems in the chain of custody do not affect the admissibility of the evidence. (31) Instead,
such problems affect the weight that the fact-finder should give the evidence, which may be
brought out and argued by the parties. (32) Point of error ten is overruled.

C. Jury Instruction

 Turning to Druery's claim that the jury should have been instructed to make a
handwriting comparison, Texas law provides, "It is competent to give evidence of
handwriting by comparison, made by experts or by the jury. Proof by comparison only shall
not be sufficient to establish the handwriting of a witness who denies his signature under
oath." (33) Druery argues that the trial judge committed error when he did not charge the jury
at punishment that it could compare the handwriting of the letter in question to the
handwriting of other letters known to have been written by him in determining the
authenticity of the letter. (34) He reasons that without such an instruction, a reasonable juror
will merely assume that the letter was written by him. Druery concedes that he did not
request an instruction regarding jury comparison or object to the lack of such an instruction. 
He argues, however, that the lack of such an instruction caused him to suffer egregious
harm. (35) We disagree.

 In reviewing charge error, we must first determine whether error exists. (36) If we find
error, we must then determine whether the error caused sufficient harm to require reversal. (37) 
As we have stated, the degree of harm necessary for reversal depends upon whether the error
was preserved. (38) Error properly preserved by an objection to the charge will require reversal
as long as the error is not harmless. (39) We have interpreted this to mean that any harm,
regardless of degree, is sufficient to require reversal. (40) But when the charging error is not
preserved, a greater degree of harm is required, and this standard of harm is described as
egregious harm. (41) Errors that result in egregious harm are those affecting the "'very basis
of the case,'" those depriving "the defendant of a 'valuable right,'" or those that "'vitally
affect a defensive theory.'" (42)

 Druery fails to demonstrate that there was any error at all in the omission of a charge
concerning handwriting comparison. He never denied that he was the author of the letter,
and we cannot say that the decision to not request such an instruction or to not object to the
lack of such an instruction was not a matter of trial strategy. But even if we were to assume
error in failing to instruct the jury to make a handwriting comparison, such error was not
egregious. Druery does not explain how the omission of the instruction at issue harmed him
other than to argue that this case was very close as to whether a life or death sentence was
appropriate. But as the State points out, other instructions in the punishment charge served
to instruct the jury as to its duty as fact-finder. 

 The jury was instructed, "You are the exclusive judges of facts proved, of the
credibility of the witnesses, and the weight to be given their testimony[.]" The jury was
additionally told, "You cannot consider any evidence of unadjudicated extraneous crimes or
bad acts other than the one charged in the indictment in this case for any purpose unless you
find and believe beyond a reasonable doubt that the defendant committed such acts, if any." 
These instructions served to guide the jury in its evaluation of the letter with regard to the
chain of custody, the fingerprint evidence, and the contents of the letter itself. As we have
stated, when a refused charge is adequately covered by the charge given, no harm is shown. (43) 
Because Druery fails to demonstrate that the omission of the instruction was erroneous or
that the omission, even if erroneous, constituted egregious harm, point of error twelve is
overruled.

Instruction on Offense of Abuse of Corpse

 In point of error thirteen, Druery complains that the trial judge erred when he refused
Druery's request to charge the jury on the offense of abuse of corpse. Druery concedes that
abuse of corpse, while a less serious offense than capital murder, is not a lesser-included
offense of capital murder. (44) He was therefore not entitled to the instruction. Point of error
thirteen is overruled.

Instruction on Lesser-Included Offense of First-Degree Murder

 In his fourteenth point of error, Druery complains that the trial court should have
instructed the jury at guilt, sua sponte, on the lesser-included offense of first-degree murder. 
He argues that the failure to include the instruction amounted to fundamental error even
though Druery, through counsel, unequivocally informed the trial court that the lesser-included instruction was not desired. We find that Druery is estopped from bringing this
claim.

 Texas law mandates that a trial court submit a charge to the jury setting forth "the law
applicable to the case," (45) and as this Court has stated, "[An appellant] must object to the
charge before he may be heard to complain on appeal about 'errors claimed to have been
committed in the charge, as well as errors claimed to have been committed by omissions
therefrom or in failing to charge upon issues arising from the facts.'" (46) On the other hand,
this Court has stated that if no proper objection was made at trial to the jury charge, an
appellant must claim that the alleged error was fundamental. (47) An appellant will obtain a
reversal only if the error was so egregious and created such harm that the he or she "has not
had a fair and impartial trial--in short 'egregious harm.'" (48) We have noted, however, that
"[i]f a party affirmatively seeks action by the trial court, that party cannot later contend that
the action was error." (49) Indeed, "the law of invited error estops a party from making an
appellate error of an action it induced." (50)

 Here, the record reveals that Druery, through counsel, affirmatively advised the trial
judge that he did not desire a charge on the lesser-included offense of first-degree murder. 
At the charge conference, the following exchange took place:

 THE COURT: Has the State had an adequate opportunity to review the
proposed charge?

 

 [STATE]: We have, Your Honor.

 

 THE COURT: And are there any objections?

 

 [STATE]: No, Your Honor.

 

 THE COURT: I want to be sure the State is not requesting a
lesser-included offense of murder.

 

 [STATE]: That's correct.

 

 THE COURT: Very well. [Defense counsel], do you have any
objections?

 

 [DEFENSE]: Yes, Your Honor, I have [three] that I will memorialize
Monday morning. I'm -- oh, I'm sorry. I have no
objections to the Court's charge as presented to us at --
at 12:40 today.

 

* * *

 

 THE COURT: All right. Court will overrule those three objections
[which concern an instruction on the use of illegally
obtained evidence, an instruction on the lesser-included
offense of abuse of corpse, and an instruction on
accomplice as a matter of law rather than of fact] with
the understanding that I expect you to memorialize those
in writing on Monday before we begin. Are there any
other objections?

 

 [DEFENSE]: Not on behalf of Mr. Druery, Your Honor.

 

 THE COURT: Be sure y'all are not asking for a lesser-included offense
of murder.

 

 [DEFENSE]: We are not, Your Honor.


 In light of the above exchange, it is evident that Druery not only did not object to the
omission of the lesser-included instruction on first-degree murder but that he affirmatively
requested, after inquiry by the trial judge, that the lesser-included instruction not be given.
Druery induced the alleged error of which he now complains. He may not now argue on
appeal that the trial judge had a duty to sua sponte give the jury an instruction on the lesser-included offense of first-degree murder in the face of his specific request that the charge not
be included. Because Druery is estopped from bringing this charge-error claim on appeal,
we do not address whether the omission of and failure to sua sponte give the lesser-included
instruction was erroneous or amounted to egregious harm. (51) Point of error fourteen is
overruled.

Future Dangerousness

 Druery claims in his twenty-first point of error that the evidence presented at trial was
legally insufficient to support the jury's finding that he would be a continuing threat to
society. (52) The State has the burden of proving the punishment issue of future dangerousness
beyond a reasonable doubt. (53) In other words, the State has the burden of proving beyond a
reasonable doubt that there is a probability that Druery would commit criminal acts of
violence in the future, so as to constitute a continuing threat, whether in or out of prison. (54) 
In its determination of the issue, the jury is entitled to consider all of the evidence presented
at both the guilt and punishment stages of trial. (55) 

 Indeed, when determining whether a defendant will pose a continuing threat to
society, a jury may consider a variety of factors. (56) As we have said, these factors include, but
are not limited to, the circumstances of the capital offense, including: the defendant's state
of mind and whether he was working alone or with other parties; the calculated nature of the
defendant's acts; the forethought and deliberateness exhibited by the crime's execution; the
existence and severity of prior crimes; the defendant's age and personal circumstances at the
time of the offense; whether the defendant was acting under duress or the domination of
another at the time of the commission of the offense; psychiatric evidence; and character
evidence. (57) But the circumstances of the offense itself "can be among the most revealing
evidence of future dangerousness and alone may be sufficient to support an affirmative
answer to that special issue." (58) As an appellate court reviewing the jury's finding, we must
view all of the evidence before the jury in the light most favorable to its finding and
determine whether, based on that evidence and reasonable inferences therefrom, a rational
jury could have found beyond a reasonable doubt that the answer to the first punishment
issue was "yes." (59) 

 The evidence presented at trial shows that Druery picked Rome up in Waco and drove
him to Bryan. He attempted on several occasions to obtain Rome's gun while at a club and
on the drive out to the Druery property. At the property, Druery was able to get the gun
while he, Pitts, Harris, and Rome shot the gun into a stock tank. During this time, Druery
informed both Pitts and Harris that he was going to kill Rome. Pitts reminded Druery that
Druery was responsible for taking care of his two-year-old son, but Druery's response was
"So, I want his stuff." 

 After ordering Pitts and Harris back to the vehicle, Druery approached Rome in a
manner by which he could not be seen, held the gun within six inches of Rome's head, and
shot him once in the head, followed by two additional shots to his neck and body. Druery
then took a cell phone, some marijuana, and some cash from Rome's body. He also kept the
gun. Druery attempted to destroy evidence of the crime by twice burning the body and by
dumping it into the stock tank. Additionally, directly after the murder, rather than
demonstrating remorse for the crime itself, Druery showed regret only for killing Rome in
front of Pitts and Harris, giving each forty dollars to calm them. He also concocted a cover
story to explain why Rome would be missing and instructed Pitts and Harris to give the story
if questioned. 

 This evidence shows that Druery killed Rome with calculation, forethought, and
deliberateness to obtain a minimal amount of personal property. Moreover, he committed
the murder even after Pitts had tried to dissuade him by reminding Druery of his obligation
to care for his own young son. 

 Evidence apart from the circumstances of the crime itself was also presented to the
jury. The State introduced evidence of his: five prior marijuana possession charges;
physically violent behavior toward a former girlfriend, which caused her severe injury; 
pointing a gun at another person in an aggressive manner when confronted about a coat;
physically assaultive behavior toward a roommate; overly hostile and violent reactions in
situations that angered or frustrated him; threats while displaying a knife to commit physical
violence upon pawn shop employees who would not refund money for some merchandise;
throwing a chair and table toward two people and swinging a mop at one of them, hitting her,
in response to an allegation that he had a puppy he was calling "Cocaine" that did not belong
to him; beating on a door, yelling that he wanted his CD's and that he was going to kill
someone; shooting a pistol while at a club on one occasion and a shotgun on another
occasion; head-butting Pitts, hitting and kicking her, choking her, and threatening to kill her
while she was his girlfriend; heavy drug use and his constant possession of weapons;
breaking into an apartment where a gun was later found to be missing; chasing Pitts with a
rifle when she refused to make him something to eat; threats to kill several people;
threatening his father, grandfather, and grandmother with a hammer; attempts to kick down
a door of a house because he wanted to use the phone; destroying property while an inmate
at the county jail and making threats while at the jail that he was going to hurt someone; and
in a letter sent from the jail containing his DNA where he wrote, "Shit if I saw him again
before I came in here I would have 2 murder cases. Fuck em all cause Im ball when I get
out." 

 A rational jury could determine from all of this evidence that there was a probability
beyond a reasonable doubt that Druery would commit criminal acts of violence in the future
so as to constitute a continuing threat, whether in or out of prison. Point of error twenty-one
is overruled.

Constitutionality of Article 37.071 of the

Texas Code of Criminal Procedure


 In his fifteenth point of error, Druery contends that the omission of a burden of proof
in the mitigation special issue, (60) which instructs the jury to consider all evidence in
determining whether sufficient mitigating circumstances warrant a life sentence instead of
a death sentence, is unconstitutional. He argues that the burden should rest with the State to
prove lack of mitigation beyond a reasonable doubt but that the burden was effectively and
wrongfully placed on him to convince the jury to forgo a death sentence for that of life.

 Druery candidly concedes that this claim has been rejected by us but asks that we
revisit the issue. (61) Druery has not distinguished his case, and we decline Druery's invitation
to revisit the issue. Point of error fifteen is overruled.

 In his sixteenth point of error, Druery complains that the rule prohibiting the trial
judge, the State, the defendant, or defense counsel from informing the jury that a failure of
the jury to agree on a special issue would result in a life rather than a death sentence being
imposed is unconstitutional. (62) Druery recognizes that we have repeatedly rejected this
claim (63) but asks that we reconsider it. He has not distinguished his case from those in which
this same claim was denied, however, and we decline to revisit the issue. Point of error
sixteen is overruled.

 In his seventeenth, eighteenth, and nineteenth points of error, Druery asserts that the
trial judge's failure to define the words "probability," "continuing threat to society," and
"criminal acts of violence" to the jury with regard to the future-dangerousness special issue
is unconstitutional. (64) Druery acknowledges that we have previously rejected these claims (65)
but asks that we reconsider them. 

 As we have previously stated, "This Court has repeatedly held that the terms . . .
'probability,' 'criminal acts of violence' and 'continuing threat to society,' . . . require no
special definitions." (66) "Where terms used are words simple in themselves, and are used in
their ordinary meaning, jurors are supposed to know such common meaning and terms and
under such circumstances such common words are not necessarily to be defined in the charge
to the jury." (67) In addition, the Supreme Court of the United States has concluded that the
submission of this special issue, even without the definitions in question, is sufficient to
constitutionally guide the jury's determination. (68) We decline to reconsider our previous
holdings, especially when it has not been shown that Druery's case is distinguished from
those cases in which these same claims were rejected. Points of error seventeen, eighteen,
and nineteen are overruled. 

 Similarly, Druery contends in his twentieth point of error that the trial court's failure
to define the jury-instruction term "moral blameworthiness" with regard to the mitigation
special issue, which asked whether there was sufficient mitigating circumstance or
circumstances to warrant a sentence of life rather than death, (69) is unconstitutional. The jury
was instructed at punishment that it "shall consider mitigating evidence to be evidence that
a juror might regard as reducing the defendant's moral blameworthiness." (70) The question
of whether the failure to define the term "moral blameworthiness" has already been decided
adversely to Druery for the same reasons discussed above, (71) and he does not distinguish his
case from those previously decided. We decline to revisit the issue. Point of error twenty
is overruled.

 We affirm the judgment of the trial court.


Delivered: April 4, 2007

Publish
1. Tex. Penal Code Ann. § 19.03(a).
2. Tex. Code Crim. Proc. art. 37.071 § 2(g).
3. Tex. Code Crim. Proc. art. 37.071 § 2(h).
4. Tex. Code Crim. Proc. art. 38.14.
5. 709 S.W.2d 194, 199 (Tex. Crim. App. 1986).
6. Tex. Code Crim. Proc. art. 38.14.
7. Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App. 1999).
8. Paredes v. State, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); Kunkle v. State, 771
S.W.2d 435, 439 (Tex. Crim. App. 1986). 
9. Paredes, 129 S.W.3d at 536.
10. Kunkle, 771 S.W.2d at 439.
11. Id.
12. Id. 
13. Id.; Paredes, 129 S.W.3d at 536.
14. Paredes, 129 S.W.3d at 536.
15. Id.
16. Id. 
17. Kunkle, 771 S.W.2d at 440.
18. See id. at 439. 
19. Paredes, 129 S.W.3d at 536.
20. Id.
21. Tex. R. Evid. 104(a).
22. Tex. R. Evid. 104(b).
23. Harrell v. State, 884 S.W.2d 154, 159-61 (Tex. Crim. App. 1994); Gonzales v.
State, 929 S.W.2d 546, 550 (Tex. App.--Austin 1996, pet. ref'd).
24. Tex. R. Evid. 901(a).
25. Tex. R. Evid. 901(b)(4).
26. Jackson v. State, 968 S.W.2d 495, 499 (Tex. App.--Texarkana 1998, pet. ref'd).
27. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); Angleton v. State,
971 S.W.2d 65, 67 (Tex. Crim. App. 1998). 
28. Moses, 105 S.W.3d at 627. 
29. Montgomery v. State, 810 S.W.2d 372, 378-79 (Tex. Crim. App. 1990).
30. Tex. R. Evid. 901(a); Kingsbury v. State, 14 S.W.3d 405, 407-08 (Tex.
App.--Waco 2000, no pet.).
31. Tex. R. Evid. 901(a); Lagrone v. State, 942 S.W.2d 602, 617 (Tex. Crim. App.
1997).
32. Tex. R. Evid. 901(a).
33. Tex. Code Crim. Proc. art. 38.27.
34. See Tex. Code Crim. Proc. art. 38.27.
35. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).
36. Id. at 171; Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).
37. Hutch, 922 S.W.2d at 171-72 (quoting Almanza, 686 S.W.2d at 172).
38. Id. at 171.
39. Id.
40. Id.
41. Id.
42. Id.
43. Davis v. State, 651 S.W.2d 787, 792 (Tex. Crim. App. 1983).
44. See Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); Tex. Code
Crim. Proc. art. 37.09.
45. Tex. Code Crim. Proc. art. 36.14.
46. Posey v. State, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998) (quoting Tex. Code
Crim. Proc. art. 36.14); see also Tex. Code Crim. Proc. art. 36.19.
47. Almanza, 686 S.W.2d at 171. 
48. Id.
49. Prystash v. State, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999).
50. Id.
51. Almanza, 686 S.W.2d at 171-72. 
52. See Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).
53. Tex. Code Crim. Proc. art. 37.071 §§ 2(b)(1), 2(c); Ladd v. State, 3 S.W.3d 547,
557-58 (Tex. Crim. App. 1999).
54. Tex. Code Crim. Proc. art. 37.071 §§ 2(b)(1), 2(c).
55. Id.
56. Wardrip v. State, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); Keeton v. State, 724
S.W.2d 58, 61 (Tex. Crim. App. 1987).
57. Wardrip, 56 S.W.3d at 594.
58. Id.; Muniz v. State, 573 S.W.2d 792, 795 (Tex. Crim. App. 1978).
59. Ladd, 3 S.W.3d at 558.
60. Tex. Code Crim. Proc. art. 37.071 § 2(e)(1).
61. See Howard v. State, 941 S.W.2d 102, 119 (Tex. Crim. App. 1996) (citations
omitted); see also Blue v. State, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003).
62. Tex. Code Crim. Proc. art. 37.071 §§ 2(a)(1), (g).
63. Davis v. State, 782 S.W.2d 211, 222 (Tex. Crim. App. 1989).
64. See Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).
65. King v. State, 553 S.W.2d 105, 107 (Tex. Crim. App. 1977).
66. Earhart v. State, 877 S.W.2d 759, 767 (Tex. Crim. App. 1994).
67. King, 553 S.W.2d at 107.
68. Jurek v. Texas, 428 U.S. 262, 275 (1976).
69. Tex. Code Crim. Proc. art. 37.071 § 2(e)(1).
70. Tex. Code Crim. Proc. art. 37.071 § 2(f)(4).
71. Blue, 125 S.W.3d at 505 (citing Wright v. State, 28 S.W.3d 526, 537 (Tex. Crim.
App. 2000); Ladd, 3 S.W.3d at 572-73; Raby v. State, 970 S.W.2d 1, 8 (Tex. Crim. App.
1998); Cockrell v. State, 933 S.W.2d 73, 93 (Tex. Crim. App. 1996)).